IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
GULFPORT DIVISION

IN RE:   DANIEL P. SLOAN                              CASE NO. 10-51022-NPO
         DEBTOR                                       CHAPTER 7
_____

AMJAD F. NAJJAR                                       PLAINTIFF

VS.                                                   Adv. Proc. No. 10-05047-npo

DANIEL P. SLOAN                                       DEFENDANT

**DANIEL P. SLOAN'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

DANIEL P. SLOAN, ("Sloan", "Defendant", or "Debtor" herein) submits this Memorandum in Opposition to Amjad F. Najjar's ("Najjar", "Plaintiff", or "Movant" herein) Motion for Summary Judgment ("Motion").

**2010 Revision of Rule 56**

Effective December 1, 2010, F.R.C.P. 56, which is made applicable to bankruptcy cases through Rule 7056 of the Federal Rules of Bankruptcy Procedure, was comprehensively revised and rewritten. This revision followed several prior attempts to make Rule 56 more discretionary for the Court. In fact, the 2007 revision to the Rule substituted the historical phrase that courts "shall grant" summary judgment if the movant makes the appropriate showing, with the term "should grant" in an effort to eliminate the ambiguity between the rule and the case law, which has, over the years, made it clear that Summary Judgment is not mandatory, despite a showing by the movant that summary judgment should be granted. This point is discussed further below. However, this change in terminology created some confusion as to whether the Rule 56 standard had actually changed, which

–1–

was not the intent of the Advisory Committee, and the 2010 revision restored the word "shall", allowing the case law interpreting the historical rule to govern the standard.

## Najjar's Failure to Meet Burden of Production

Najjar has the burden of production to meet his burden under Rule 56. Although he has produced some documents, many of which are not admissible, as discussed further below, the law requires that the movant's papers be carefully scrutinized, while those of the opposing party, Mr. Sloan, are indulgently regarded. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L. Ed. 2d 684 (1976) (for purposes of motion, nonmovant's version of facts must be accepted, and all disputed matters must be resolved in nonmovant's favor.)

Najjar has not met this initial burden and, therefore, summary judgment is improper, even absent any further showing by Mr. Sloan.

## Najjar's Documents in Support of his Motion are Inadmissible

Rule 56(c)(2) prohibits the consideration of materials cited to support a fact which cannot be presented in a form that would be admissible in evidence. Mr. Sloan objects to the following materials which should not be considered:

All deposition excerpts presented by Plaintiff, including Exhibits C, L, M, O, P, and R, are from depositions in other cases which are not before this court. As appellate courts have determined, deposition testimony offered in conjunction with summary judgment must be properly authenticated by the movant; authentication requires identifying the deponent and including the court reporter's certification that the deposition is a true record of testimony of the deponent. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-774 (9th Cir. 2002). None of these deposition excerpts from depositions in other cases have been properly authenticated by the Movant. Moreover, Exhibit

C, the deposition transcript of Amnon Lutfak, is rank hearsay. Amnon Lutfak is not a party to this case and in order for an out-of-court statement of a witness to be excluded from the definition of "hearsay" by Rule 801(d)(1), the declarant, Lutfak in this case, must be a witness at the trial or hearing at which the statement is offered and the declarant must be available for cross-examination concerning the content of the statement. FRE 801(d)(1); *United States v. Harrison*, 296 F.3d 994, 1006-1007 (10th Cir. 2002).

## Legal Standard

First, it is important to note that this Court can deny summary judgment "when it has *any* doubt as to the wisdom of terminating the action prior to a full trial." *Wright & Miller,* § 2728.

Although F.R.C.P. 56, as adopted by F.R.B.P. 7056 to apply in bankruptcy cases has seen a number of revisions, the same familiar, but difficult standard and high burden still applies. The United States Supreme Court has held that the party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The facts are reviewed drawing all reasonable inferences in favor of the party opposing the motion. *Matagorda County v. Russell Law*, 19 F.3d 215, 217 (5th Cir.1994).

This is an extremely difficult burden which Najjar has simply not met.

## Najjar's Provides No Undisputed Facts On Which To Rely

Najjar presents to the Court an *Itemization of Undisputed Facts.* [Dkt No. 32] ("Itemization"). This Itemization is presented in bad faith and should be entirely ignored by the Court except insofar as the Court uses it to determine that there are, in fact, genuine disputes to material facts.

Items 1 through 3, items 7 and 8, and item 10 of the Itemization are benign enough. They certainly don't present a basis for summary judgment in this case, whether or not they are disputed. However, all or part of items 4-6 and item 9 are all vehemently disputed by Mr. Sloan. Moreover, many of the assertions in the Itemization are based on inadmissible evidence. This is discussed further in other parts of this Memorandum.

If the showing made by Najjar is insufficient, Mr. Sloan need do nothing, as he may resist summary judgment on Najjar's insufficiency alone. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160-161, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).

### Affidavit Submitted by Najjar Proves Summary Judgment is Inappropriate

Perhaps the most compelling piece of evidence in opposition to Najjar's Motion is his own Affidavit. See Exhibit T to Motion.

In Najjar's Affidavit, he swears that he made a "Capital Contribution" to LADS Ventures, L.P. See ¶ 3 of Affidavit. He further swears that, "When I made my Capital Contribution, I was relying on Defendant **Amnon Lutfak's** representations that my Capital Contribution would be used as security. . . . Because of **Lutfak's** fraudulent misrepresentations directed to me, I have been damaged in the amount of at least $831,223.16…." See ¶ 4 of Affidavit.

Najjar has, therefore, admitted in his Affidavit that he relied on the statements of another person and not on Mr. Sloan. This Affidavit alone should be the basis for denial of his summary judgment. If nothing else can be shown by this Affidavit, it is clear that there is a genuine dispute as to a material fact – whether, assuming *arguendo* that some fraud existed (there clearly was not) then who's statements did Najjar rely on – Lutfak or Sloan? There is nothing presented

–4–

in any document or other evidence produced by Najjar to support his contention that he relied on Sloan in this regard.

## FACTS

The facts of this case are lengthy and complex; however, they can be boiled down to the following:

1. It is undisputed that in early to mid-2006, Najjar had conversations with Amnon Lutfak and Mr. Sloan regarding the purchase of his home located at 24 Tiel Way, Houston, Texas. Mr. Sloan personally borrowed $1.1 million dollars to purchase this property. This was not a guaranty. Mr. Sloan was the Maker of the Note. It was his primary obligation.

2. In September 2006, Hampton Windfall Ventures (HWV) purchased 20 Tiel Way, Houston, Texas, borrowing approximately $990,000.00 in the name of HWV, with Mr. Sloan personally guaranteeing this Note.

3. Mr. Sloan also contributed, in addition to his personal obligation on the $1.1 million dollars to purchase 24 Tiel Way, Mr. Sloan contributed approximately $160,000.00 related to 20 Tiel Way and 24 Tiel Way.

4. Mr. Sloan's capital contributions, including recourse obligations against him, personal loans and hard cash contributed to the company were approximately $2.2 million.

5. Najjar's capital contribution to the venture was, by his calculation $1.2 million. However, anything that he contributed is offset by the $1.2 million Note which he took from the partnerships. Therefore, his capital contribution is Zero.

6. Najjar delayed in closing 24 Tiel Way and, in fact, didn't convey the property until December 7, 2006.

7. In relation to this Joint Venture, Najjar took a Note from 20 Tiel Way, L.P. and 24 Tiel Way, L.P. in the amount $1.2 million ("Note"). See Exhibit 1.

8. This Note was dated July 1, 2006, five months before the actual closing of the property and contribution of funds by Najjar.

9. During the first week of January, 2007, a month after the closing, Najjar made a demand for "past due" payments on the Note, still in its infancy, dating back to August, 2006, plus, of all things, a **late payment** of $900.00 on each monthly payment which was "past due" on the back-dated note. See Exhibit 2.

10. Shortly after this January demand for the "late payments", Najjar filed a lis pendens on the property and filed a lawsuit against Amnon Lutfak for recovery of funds on this Note which was still only two months old.

11. Mr. Sloan was not included in the original suit to recover money.

12. Mr. Sloan was added to the lawsuit only **after** Amnon Lutfak filed for bankruptcy protection in mid-2007.

13. This lawsuit and the lis pendens prevented the joint ventures and partnerships from obtaining construction loans to renovate the properties and then, as planned, resell them to repay Najjar.

14. Prior to entering any transaction with Mr. Sloan, Najjar had two attorneys and a private banker and a CPA advise him on the transaction. See pp 13-15 of Exhibit 3 (Najjar's deposition),

15. Najjar later sued his attorney and, by my count, some TWENTY other defendants, including banks, individuals, and corporate entities. See Exhibit O to the Motion.

16. If Najjar had simply proceeded as outlined to him by his advisors, including his attorney who he sued, the properties could have been renovated and sold in an orderly fashion and he would have received the return of his money, plus profits.

### Any Distribution to Sloan was a Mere Return of Capital Contribution

Much is made by Najjar of the distributions by LADS Ventures, L.P. ("LADS") to Mr. Sloan of approximately $230,000.00 to $250,000.00. However, as outlined above and below, these distributions were nothing more than a return of capital contributions which Mr. Sloan had made. He contributed $2.2 million and took $250,000.00 back. He was still almost $800,000.00 ahead of Najjar in capital – by Najjar's calculation, and almost $2.4 million ahead of him in actuality. See calculations below.

### Najjar's Own Attorney Prepared all Documents

It's also important to note and, further, is undisputed that Najjar's own attorney, John Weatherly, prepared all corporate documents, all contracts, all agreements, and all other documents related to this transaction.

## ARGUMENT

Najjar has requested summary judgment on his claims of non-dischargeability for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny pursuant to Section 523(a)(4) and because the money obtained, according to him, was by false pretenses, false representations or actual fraud pursuant to Section 523(a)(2)(A).

### 523(a)(2)(A)

In support of Najjar's position, he presents the following in his section entitled "Evidence of Sloan's representation":

1. That Sloan did not intend to make monthly $9,000.00 payments which the Note obligated him to pay,

2. That Sloan did not intend to repay the $1.2 million,

3. That Sloan used unchartered companies as a sham to perpetrate a fraud,

4. That Sloan substituted these unchartered entities in a Promissory Note in order to facilitate theft, and

5. That Sloan intended to steal and convert Plaintiff's money to his personal use.

These assertions are so incredible as to make Najjar completely unbelievable.

The evidence is clear that no such false representations were ever made. Najjar presents no evidence in support of this allegation. Indeed, the evidence is clear that no such representation was made. For example, the Note was dated July 1, 2006, but not signed until December 2006. See Ex. 3 (Najjar's Deposition) at p. 49:12. Also See Exhibit 1 (Promissory Note).

Moreover, the affidavit presented by Najjar in support of his motion doesn't even mention Mr. Sloan. See Exhibit T to Motion. Further, another affidavit presented in support of a different suit, does not mention Mr. Sloan. See Exhibit 4 (Affidavit of Amjad Najjar dated January 30, 2007, approximately six weeks after the Note was signed). All of the assertions in both affidavits are against Amnon Lutfak. Indeed, Mr. Sloan's name is not even mentioned.

Further, Najjar's claimed false assertions pertain to a future promise to pay. In fact, **payment was made.** See paragraph 7 of Exhibit 4, where Najjar swears that he actually received a payment on January 12, 2007, one month after the Note was paid. On the same day that he received this payment, presumably because it was for less than six months worth of payments plus late fees on this brand new note, Najjar sent a demand letter for $49,500.00. See Exhibit 2.

Regarding Najjar's allegations of false assertions pertaining to a future promise to pay, it should be noted that "[a] distinction is drawn between statements as to matters of fact on the one hand and promises of future action on the other. The former is within the statutory language and the latter is not." *Collier Bankruptcy Practice Guide* 76.05[1]. Within thirty-five days of the Note being signed, Najjar demanded payment of, what he called, "past due" payments going back five months prior to the signing of the Note, including , incredibly, "late fees" for those "past due" payments.

In fact, as sworn by Najjar, he had actually received a payment on the Note within thirty-five days of the signing of that Note. The receipt of a payment is a complete and total rebuttal to Najjar's argument that Sloan, or anyone else, never intended to pay him

his money. The only payment due prior to Najjar's demand and subsequent lawsuit was actually paid, evidencing an actual intention to fulfill the future promise to pay. See Ex. 4.

### 523(a)(4)

The second assertion against Mr. Sloan is that a fiduciary duty existed by Mr. Sloan to Mr. Lutfak and such duty was breached by fraud or defalcation.

Jumping through intellectual hoops and legal gymnastics, Najjar tries to establish this fiduciary relationship in four ways, three of which fail on their face:

1. Najjar references a December 7, 2006, Nominee and Trust Agreement between HWV and 20 Tiel Way, L.P.. This Agreement was not attached to the Motion and cannot be the basis for Summary Judgment as it is not before the Court. Notwithstanding this fatal defect, Najjar attempts to establish a fiduciary relationship because, as he argues, HWV was the alter-ego of Sloan. Najjar presents no evidence or law that HWV was the alter-ego of Sloan. In fact, the only mention of HWV and Sloan's relationship is this singular unsupported phrase.

2. Najjar also references a Nominee and Trust Agreement in which Sloan assumed the position and fiduciary duties of a trustee to beneficiary 24 Tiel Way. Although Najjar references "Exhibit P", he does not produce this Agreement. In fact, "Exhibit P" is an excerpt from a deposition. Again, this is a fatal defect as the referenced agreement is not before the Court.

3. Humorously, Najjar attempts to establish a fiduciary relationship because he had a "special confidential relationship" with Mr. Sloan prior to and apart from the

–10–

business transaction at issue. This is laughable in light of Najjar's own testimony at his deposition. At his deposition, the following testimony was elicited:

> **Q: Okay. You also alleged in your complaint that you had a special confidential relationship with Mr. Sloan prior to your partnership with him?**
>
> A: Uh-huh (Affirmative).
>
> **Q. What did you mean by that?**
>
> A: That there was a trust issue that I had – I had believed that he would do what he had – he and his company alleged that they would do or represented that they would do. That's what I was –
>
> **Q: Okay. You weren't – prior to your contribution – strike that.
> Prior to you entering into these contracts or negotiations with Mr. Sloan, were you in any other business dealings with him? With Mr. Sloan?**
>
> A: Not other than buying my house.
>
> **Q: And you're not personally related in any way are you?**
>
> A: To Mr. Sloan?
>
> **Q: Yeah, no family relationship?**
>
> A: No. We used to go to the same church, but.

Exhibit 1 at pp. 70-71.

So, Najjar believes there was a special confidential relationship because he used to go to the same church as Mr. Sloan? No other facts are presented besides the conclusory and unsupported assertion in Najjar's Memorandum.

–11–

4.     Finally, Najjar makes a legal claim that passes the red-face test, albeit an argument that is, once again, completely unsupported by the facts and, in fact, is more damning to Najjar than to Sloan.

Najjar rightly asserts that partners owe each other a fiduciary duty.  However, he offers no factual support that would indicate that Mr. Sloan breached that fiduciary duty.  His only claim is that Mr. Sloan transferred money and, therefore, he must have committed, not only fraud, but the crimes of theft, embezzlement, and larceny.

Well, Mr. Sloan was fully entitled to transfer that money.  In fact, the subject partnership agreements contain the following relevant provisions:

> **4.05 Capital Accounts**.  A capital account shall be established and maintained for each Partner.  Each Partner's capital account (a) shall be increased by (i) the amount of money contributed by that Partner to the Partnership, (ii) the fair market value of property contributed by that Partner to the Partnership (net of liabilities secured by the contributed property that the Partnership is considered to assume or take subject to under section 752 of the Code), and (iii) allocations to that Partner of Partnership income and gain (or items thereof), …. and (b) shall be decreased by (i) the amount of money distributed to that Partner by the Partnership, (ii) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by the distributed property that the Partner is considered to assume or take subject to under section (752) of the Code), (III) allocations to that Partner of expenditures of the Partnership described in section 705(a)(2)(B) of the Code, and (iv) allocations of Partnership loss and deduction ….  The Partners' capital accounts also shall be maintained and adjusted as permitted by the provisions of [applicable Treasury Regulations]….

See Exhibits E and F to Motion.

In other words, if Sloan's capital account needed adjustment, the partnership was not only allowed, but required, to make appropriate adjustments.

So, going through a simplistic calculation of Najjar's and Sloan's capital accounts, according to the Partnership Agreements, it is quickly concluded that Najjar's capital account was as follows:

a. Najjar contributes $831,233.16. His capital account is increased to this amount.

b. Then, Najjar receives a Note from the partnerships with a face amount of $1,200,000.00. His capital account is decreased by this amount.

c. The sum of these two adjustments to his capital account results in a balance of a ($368,766.84). Less than Zero.

Mr. Sloan, on the other hand, as outlined above in the section labeled "FACTS", had a capital account approaching $2.2 million. He was not only entitled to withdraw the $250,000.00, but, was **required** to by the Partnership Agreement. This same fact, completely rebuts the Plaintiff's argument regarding "Sloan's Embezzlement, Theft and Larceny".

Further, the entire argument of Plaintiff regarding "Conspiracy" is completely misplaced. As outlined above, there was no fraud on the part of Mr. Sloan.

## CONCLUSION

For the reasons stated above, it is clear that there is a genuine issue of material fact which precludes summary judgment. Therefore, the Plaintiff's Motion should be denied. Moreover, the Court should exercise its authority under the 2010 revision to Rule 56 and grant summary judgment in favor of Mr. Sloan and against Najjar for the reasons outlined in this Memorandum and the supporting documentation attached to the Response.

Respectfully submitted this 15TH day of April, 2011.

                                                       Respectfully Submitted,
                                                       Daniel P. Sloan

                                   BY:    s/John D. Moore
                                                   JOHN D. MOORE, MSB NO. 10610

Moore & Manhein, LLP
301 Highland Park Cove, Suite B (39157)
Post Office Box 3344
Ridgeland, Mississippi 39158-3344
601-853-9131
Fax: 601-853-9139
Email: john@johndmoorepa.com
ATTORNEY FOR DANIEL P. SLOAN

## CERTIFICATE OF SERVICE

   I hereby certify that I served the foregoing via the Court's electronic transmission facilities by filing this document with the Court's ECF system upon the following:

**Wayne H. Paris**
Gillis, Paris & Heinrich, PLLC
8 Greenway Plaza, Suite 818
Houston, TX  77046

**Benjamin Lyle Robinson**
Phelps Dunbar LLP
PO Box 16114
Jackson, MS 39236-6114
Email: robinsol@phelps.com

**James W. O'Mara**
Phelps Dunbar LLP
P.O. Box 16114
Jackson, MS 39236-6114
Email: omaraj@phelps.com

**Tommie Wilsford Allen**
Phelps Dunbar LLP
4270 I-55 North
Jackson, MS 39211
Email: allent@phelps.com

**Derek A Henderson**
111 E. Capitol St., Suite 455
Jackson, MS 39201

   This 15th day of April, 2011.

                *s/John D. Moore*
                JOHN D. MOORE